## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

OKLAHOMA STATE UNIVERSITY )
MEDICAL CENTER, )
744 West 9th Street )
Tulsa, OK 74127, )
 )
                  Plaintiff, )
 )
      vs. )
 )      Civil Action No. _____
XAVIER  BECERRA, Secretary, )
U.S. Department of Health and Human Services )
200 Independence Avenue, S.W. )
Washington, DC 20201, )
 )
                Defendant. )
_____)

## COMPLAINT

Plaintiff, Oklahoma State University Medical Center ("the Hospital"), by and through its undersigned attorneys, brings this action against defendant Xavier Becerra, in his official capacity as the Secretary ("the Secretary") of the Department of Health and Human Services ("HHS"), and states as follows:

## PRELIMINARY STATEMENT

1.      This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §§1395 *et seq.* (the "Medicare Act"), which establishes the Medicare program, the Administrative Procedure Act, 5 U.S.C. §§551 *et seq.* (the "APA"), and other authorities.  Congress requires the Secretary to make additional Medicare payments to hospitals that serve a disproportionately high percentage of low-income patients.  These additional payments, which are known as "disproportionate share hospital" or "DSH" payments, are made because low-income patients are

generally more expensive to treat than higher-income patients, even for the same medical conditions.

2.      One of the categories of low-income patients that Congress requires the Secretary to consider in calculating DSH payments is the portion of a hospital's inpatient days made up "of patients who … were eligible for medical assistance under a State plan approved under [the Medicaid statute, title XIX of the Social Security Act], but who not entitled to" inpatient Medicare benefits.  42 U.S.C. §1395ww(d)(5)(F)(vi)(II).  The Secretary's regulation requires the Secretary to calculate DSH payments based on the total number of days that Medicaid-eligible patients, who were not also entitled to Medicare, receive inpatient acute care services at the hospital in a given fiscal year ("FY").  42 C.F.R. §412.106.  The Hospital is a non-profit, general acute-care hospital located in Tulsa, Oklahoma which, during the fiscal period at issue in this action (FY 2008), qualified for a DSH payment.  The Hospital challenges its FY 2008 DSH payment as unlawfully low because the Secretary excluded from its calculation days from the Medicaid-eligible children and adolescents who received inpatient hospital acute care services in the Hospital's Four Child and Adolescent Behavioral Health Units ("the Four Units").

3.      The Secretary's exclusion of the inpatient days from the Four Units was unexpected because the Secretary (a) included Medicaid-eligible inpatient days from the Four Units in the DSH calculation for many years before changing course in 2015, (b) applied the new policy retroactively, here to FY 2008, and (c) did not use notice-and-comment rulemaking, as Congress required, when implementing this new policy.  In doing so, the Secretary does not contend that the Medicare Act requires the exclusion.  Rather, the Secretary asserts that a regulation that he adopted in 2003 supports the change in policy, even though the Secretary continued to include Medicaid-eligible

inpatient days from the Four Units in the DSH calculation for more than a decade after the 2003 regulation was adopted.

4.     The Secretary's basic justification for excluding the Medicaid-eligible inpatient days from the Four Units from the Hospital's FY 2008 DSH calculation is that the inpatient acute care hospital services that the Four Units provided was allegedly not at an intense enough level to qualify for payment under the Medicare Hospital Inpatient Prospective Payment System ("IPPS").  The Secretary relied on this justification even though (a) the Secretary did not perform any medical review of the services provided at the Four Units, and (b) Medicare paid for services provided in the Four Units using IPPS.

5.     The Hospital challenged this exclusion by filing an administrative appeal with the Provider Reimbursement Review Board ("PRRB").  During a four-day hearing that included testimony from the Hospital's two lay and three expert witnesses, including a psychiatrist who specializes in the treatment of children and adolescents, the Hospital provided overwhelming proof that the inpatients in the Four Units needed and received inpatient hospital services payable under IPPS.

6.     The contractor representing the Secretary before the PRRB (a) did not present any witnesses at the hearing or otherwise to rebut the Hospital's testimony, and (b) conceded that the Medicare program performed no medical review at the Four Units (for FY 2008 or otherwise).  Thus, the administrative record here <u>contains no factual support</u> for the Secretary's assertion that the Four Units did not provide inpatient acute care services at an intense enough level to be payable under IPPS.  The Hospital presented additional arguments showing that the MAC's exclusion was incorrect as a matter of fact and law.

7.    Despite record evidence demonstrating that the Four Units met all statutory and regulatory requirements for inclusion of their inpatient days in the DSH calculation, and other arguments showing that the exclusion was unlawful, the PRRB upheld the exclusion in a decision issued on September 30, 2024 (Exhibit A, hereto).  The PRRB's decision to uphold the exclusion is unlawful and should be set aside primarily because it is not based on substantial evidence given that (a) the uncontroverted record evidence shows that the Four Units provided an acute level of care, and (b) there is <u>no</u> evidence to support a contrary conclusion.  The PRRB's errors are similar to errors that the PRRB made, and that this Court reversed, in a different appeal.  *See Pomona Valley Hosp. Med. Ctr. v. Becerra*, 82 F.4th 1252 (D.C. Cir. 2023) (affirming District Court's reversal of the PRRB's decision based on lack of substantial evidence where (as here) the hospital presented unrebutted testimony and evidence).  In reversing the PRRB, this Court stated:

> The question is whether upon review of the entire record, there was substantial evidence to support the *Board's* decision that plaintiff's SSI fraction had been properly determined by CMS. 5 U.S.C. § 706(2)(E); *Biloxi Reg'l Med. Ctr.,* 835 F.2d at 348-49.

> The Board did not make a serious effort to address this question.  It concluded that because it could poke holes at what plaintiff provided, it did not need to examine the accuracy of what CMS did.

*Pomona Valley Hosp. Med. Ctr. v. Becerra*, No. 18-cv-2763, 2020 WL 5816486, at *10 (D.D.C. Sept. 30, 2020) (emphasis in original).  Here, as in *Pomona*, there is no substantial evidence to support the Board's decision.

8.    The PRRB's decision is unlawful and should be set aside for several other reasons, including because (a) the exclusion violates the plain reading of the Medicare DSH statute and implementing regulations because it is indisputable that the Four Units were a non-excluded part of an IPPS hospital that provided inpatient hospital services payable under IPPS, (b) it is arbitrary and capricious under the APA to <u>exclude</u> the Medicaid-covered services furnished in the Four

Units while <u>including</u> Medicaid-covered services under similar circumstances for another Oklahoma hospital, without any explanation for the disparate treatment, (c) the exclusion violates the clear purpose of the Medicare DSH statute, which Congress enacted to provide additional payments to hospitals, including the Hospital, that treat a high percentage of low-income patients and explicitly required the Secretary to include days related to Medicaid-eligible patients, and (d) in addition to its substantive invalidity, the Secretary's new about-face interpretation of the DSH regulation to exclude the Medicaid-eligible from the Four Units is procedurally invalid because the Secretary improperly applied this change retroactively to the Hospital's FY 2008 after having included patient days from the Four Units in the Medicaid fraction for many years before FY 2008, and without adopting the policy change using notice-and-comment rulemaking, as required by 42 U.SC. §1395hh(a)(2).

9.    With *Chevron* deference overruled (*see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024); *Relentless, Inc. v. Dep't of Commerce*, 144 S. Ct. 2244 (2024) (consol.)), courts may no longer routinely uphold the decisions of agencies in technical fields simply because of the complexity of the statutory schemes they oversee.  Rather, "statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning." *Id.* at 2266. And it is the job of the Court to discern the "best" reading.  *Id.*  ("In the business of statutory interpretation, if it is not the best, it is not permissible."). In this new paradigm, more than ever, the PRRB's decision must fall, and the Hospital is entitled to the relief it seeks, which is an order setting aside the PRRB's decision and directing the Secretary to pay the Hospital the additional amounts due plus interest.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction under 42 U.S.C. §1395oo(f)(1) (appeal of final Medicare program agency decision) and 28 U.S.C. §1361 (mandamus).

11.     Venue lies in this judicial district under 42 U.S.C. §1395oo(f) and 28 U.S.C. §1391.

## PARTIES

12.     Plaintiff Oklahoma University State Medical Center (Medicare Provider No. 37-0078) is a not-for-profit, acute-care hospital located in Tulsa, Oklahoma.  At all times relevant to this action, the Hospital was eligible to participate in the Medicare program.

13.     Defendant Xavier Becerra, is sued in his official capacity as the Secretary of the Department of Health and Human Services, the federal department that contains the Centers for Medicare & Medicaid Services ("CMS").  The Secretary, the federal official responsible for administration of the Medicare Program, has delegated the responsibility to administer that program to CMS.  Before June 14, 2001, CMS was known as the Health Care Financing Administration ("HCFA").  In this Complaint, the Hospital generally refers to the agency as CMS.

## LEGAL AND REGULATORY BACKGROUND

### *The Medicare Program and Medicare Part A*

14.     The Medicare Act establishes a federal program of health insurance for the aged, disabled, and individuals with end-stage renal disease.  Pursuant to 42 U.S.C. §1395cc, the Hospital entered into a written agreement with the Secretary to be paid for providing hospital and other services to Medicare-eligible individuals.  Part A of Medicare provides coverage and payment for, *inter alia*, inpatient hospital treatment.  *See id*. at §1395d(a).  Only Part A is at issue in this action.

15.     The Medicare program is administered by the Secretary through CMS.  42 U.S.C. §1395kk(a); *Health Care Financing Administration Reorganization Order*, 42 Fed. Reg. 13,262 (Mar. 9, 1977).  The Medicare statute grants the Secretary rulemaking authority to promulgate regulations to administer the Medicare program, specifying that the rulemaking process must

include a public comment period of at least 60 days.  42 U.S.C. §1395hh(a)(1), (b)(1).  The statute

also requires that any "rule, requirement, or other statement of policy" that "establishes or changes

a substantive legal standard governing . . . the payment for services" must go through this

rulemaking process.  *Id*. §1395hh(a)(2).  The Supreme Court has explained that this broad

rulemaking requirement (a) does not apply only to the establishment or changing of rules with the

force and effect of law, but could also apply to guidance that governs "payment for services," and

(b) is in addition to the procedural requirements of the APA.  *See Azar v. Allina Health Services*,

139 S. Ct. 1804, 1811 (2019).

16.    Medicare payment to providers of services is commonly carried out by contractors

acting as agents of the Secretary pursuant to contracts with him.  These contractors, which are now

called "Medicare Administrative Contractors" ("MACs"), were formerly called Medicare Fiscal

Intermediaries.  Each Medicare-participating hospital is assigned to a MAC.  The Hospital's

current MAC is Novitas Solutions, Inc., but the Hospital had other MACs during the time relevant

to this action.  In this Complaint, we use "MAC" to refer to Novitas Solutions, Inc., or any other

entity previously serving as the Hospital's MAC.

### The Medicare Hospital Inpatient Prospective Payment System

17.    Medicare beneficiaries receive inpatient hospital services from acute care hospitals,

such as the Hospital, that have entered into provider agreements with CMS.  Since 1983, the

Medicare program has paid most hospitals for the operating costs relating to the provision of

inpatient hospital services to Medicare beneficiaries under IPPS, which is found at subsection (d)

of Section 1886 of the Social Security Act.  42 U.S.C. §1395ww(d)(l)-(5); 42 C.F.R. Part 412.

IPPS applies to inpatient hospital services furnished by a "subsection (d) hospital."  42 U.S.C.

§1395ww(d)(1)(A).  IPPS is a system that fixes standard, nationwide reimbursement rates for

categories of treatment, subject to various adjustments. *Shands Jacksonville Med. Ctr., Inc. v. Azar*, 959 F.3d 1113, 1115 (D.C. Cir. 2020); *see* 42 U.S.C. §1395ww(d)(1)-(5).

### *The DSH Adjustment and the Medicaid Fraction*

18.     One of the hospital-specific adjustments to the IPPS reimbursement rate is the DSH adjustment, which "gives hospitals serving an 'unusually high percentage of low-income patients' enhanced Medicare payments." *Becerra v. Empire Health Found.*, 142 S. Ct. 2354, 2359 (2022) (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 150 (2013)); *see* 42 U.S.C. §1395ww(d)(5)(F); 42 C.F.R. §412.106.  The Hospital is a Medicare-participating hospital that, at all times relevant to this action, qualified for a DSH payment.

19.     Congress enacted the DSH payment because it found that hospitals treating a large population of low-income patients tend to incur higher operating costs per case for all discharges. H.R. Rep. No. 99-241(I), at 15 (1985), *as reprinted in* 1986 U.S.C.C.A.N. 579, 593-94.  Congress found hospitals generally have these higher operating costs due to additional structural costs reflecting "extra overhead costs and higher staffing ratios" that reflect the need for special personnel, higher security, and "high standby costs" to maintain special units like trauma, emergency psychiatric, and neonatal intensive care units.  *Id*. at 16.  Congress established the Medicare DSH payment to "balance the inequities which exist for hospitals that treat a disproportionate number of low income patients." *Jewish Hospital v. Secretary of Health and Human Services*, 19 F.3d 270, 274 (6th Cir. 1994).  The "overarching intent" of the statute is to provide additional Medicare payments to hospitals that serve "'low income' persons." *Id*. at 275.

20.     A hospital's qualification for a DSH adjustment, and the amount of DSH payment made to a qualifying hospital, are based, in part, on the hospital's "disproportionate patient percentage" ("DPP").  *Id*.; 42 C.F.R. §412.106(b).  The statute defines "disproportionate patient

percentage" as the sum of two fractions—the Medicare (or "SSI") and Medicaid fractions.  42 U.S.C. §1395ww(d)(5)(F)(vi); 42 C.F.R. §412.106(b).

21.    The Medicaid fraction, at issue here, is the percentage of a hospital's total inpatient days attributable to inpatients who were eligible for Medicaid (but not entitled to Medicare) when the services were provided. 42 U.S.C. §1395ww(d)(5)(F)(vi)(II). According to CMS's regulations, a hospital's MAC determines the Medicaid fraction:  "The [MAC] determines . . . the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A, and divides that number by the total number of patient days in the same period."  42 C.F.R. §412.106(b)(4).  In general, the higher the number of "medical assistance days," the greater the Medicaid fraction, and the larger the resulting DSH payment.

### *The Regulation Addressing Counting Inpatient Days for DSH Payment Purposes*

22.    The regulation implementing the DSH statute originally provided for inclusion in the Medicaid fraction of all patient days in "areas of the hospital that are subject to [IPPS]." 42 C.F.R. §412.106(a)(1)(ii) (2002); *see also* 53 Fed. Reg. 38,476, 38,480 (Sept. 30, 1988) (interpreting the statute as requiring CMS to include "those inpatient days to which the prospective payment system applies" and to exclude the patient days in distinct-part exempt units of the hospital).  Furthermore, CMS stated in rulemaking that "if the nature of care provided in the ward or unit is consistent with what is typically furnished to acute care patients, and . . . characteristic of services paid under IPPS," then "the unit or ward would be classified as inpatient acute care" and the inpatient days are counted in the DSH calculation.  68 Fed. Reg. 45,346, 45,417 (Aug. 1, 2003).  The focus, according to CMS, is on the nature of the care generally provided on the unit "regardless of whether these units or wards are separately certified." *Id*.

23.    In 2003, CMS revised the DSH regulation with respect to patient days counted in the DSH calculation in response to the decision by the United States Court of Appeals for the Ninth Circuit in *Alhambra Hospital v. Thompson*, 259 F.3d 1017 (2001), allegedly as a "clarification" and "codification of the Secretary's longstanding policy."  68 Fed. Reg. at 45,417–18.

24.    The issue in *Alhambra* was whether the DSH calculation should include the days in an area of an IPPS hospital that provided *only* non-inpatient hospital services, specifically "subacute" skilled nursing care services, that were furnished in beds that were included in the hospital's complement of Medicare-certified hospital beds but were licensed by the State as skilled nursing facility ("SNF") (as opposed to inpatient hospital) beds.  259 F.3d at 1073.  CMS excluded the patient days associated with these beds for DSH payment purposes because (a) the beds were licensed by the State as SNF beds and (b) the beds were used to provide SNF, not IPPS, services. *See id.* at 1073, 1075.  The Ninth Circuit reversed, concluding that the days should be included in the DSH calculation because the plain language of the regulation in effect at that time called for the inclusion of patient days "attributable to areas of the hospital that are subject to the [inpatient] prospective payment system" and the "subacute" units at issue were in such areas of the hospital. *Id.* at 1074–75.

25.    In response to the *Alhambra* decision, CMS revised the DSH regulation. 42 C.F.R. §412.106(a)(1)(ii) (2007); 68 Fed. Reg. at 45,416–18.  The revised regulation states for purposes of the DSH calculation that "the number of patient days in a hospital includes only those days *attributable to units or wards of the hospital providing acute care services generally payable under the [Medicare inpatient] prospective payment system*." 42 C.F.R. §412.106(a)(1)(ii) (2007) (emphasis added).  Thus, as revised, the regulation (a) includes for DSH payment purposes patient days in an IPPS hospital unit that provides inpatient hospital services generally payable under IPPS

and (b) excludes for DSH payment purposes patient days, like those at issue in *Alhambra*, in a non-exempt area of an IPPS hospital that does not provide inpatient hospital services payable under IPPS.  CMS's stated intention was not to "focus on the level or type of care provided to individual patients in a unit, but rather on the level and type of care provided in the unit as a whole."  68 Fed. Reg. at 45,417.

26.     The revised regulation also identified specific categories of inpatient days "otherwise countable" that nonetheless are excluded from the DSH payment calculation, including: (a) patients treated in beds in so-called "distinct part" units that by statute are excluded from IPPS, (b) beds used for outpatient observation, skilled nursing swing beds, or inpatient hospice, (c) unoccupied beds that have not provided an inpatient level of care in the preceding three months, and (d) beds that are otherwise occupied that could not be made available for inpatient use within 24 hours.  *See* 42 C.F.R. §412.106(a)(1)(ii) (2007).

27.     Under 42 U.S.C. §1395ww(d)(1)(B), an IPPS hospital includes all inpatient areas of an acute care hospital except an area that is certified by Medicare as a distinct-part unit, such as the Hospital's geriatric psychiatric unit, which is exempt from IPPS.  Thus, for DSH payment purposes, a hospital may include "only those days attributable to units or wards of the hospital providing acute care services generally payable under [IPPS]. . . ."  42 C.F.R. §412.106(a).  "[M]any hospitals have 'psychiatric units,' however; only those units that are separately certified from the hospital and meet the requirements of 42 C.F.R. §412.23, §412.25, and §412.27 [*i.e.*, requirements for psychiatric hospitals and distinct part units] are excluded from [IPPS]."  68 Fed. Reg. 66,920, 66,922 (Nov. 28, 2003).  Here, the Four Units indisputably <u>are not</u> separately certified by Medicare as distinct-part units.  Thus, all Medicaid-eligible inpatient days

from the Four Units must be included for DSH payment purposes because they meet this and all other requirements for inclusion.

28.    That rulemaking also addressed a hospital unit that provides inpatient hospital services not generally payable under IPPS but generally payable under Medicaid.  Specifically, when a hospital furnishes services that Medicaid covers in a healthy newborn nursery that does not generally provide services that would be covered by IPPS as inpatient hospital services, the Medicaid-covered patient days in that area are included in the DSH calculation.  68 Fed. Reg. at 45,417.  Although the "costs, days, and beds associated with a healthy newborn nursery are excluded from inpatient calculations for Medicare purposes" because "Medicare does not generally cover services for infants," the Medicaid-covered patient days in the healthy newborn nursery are counted in the DSH payment calculation because "Medicaid does offer extensive coverage to infants, and nursery costs would be directly included in calculating Medicaid hospital inpatient care costs."  *Id*.

### *Medicare Payment for Inpatient Psychiatric Services/Acute Behavioral Services*

29.    Medicare regularly pays for acute behavioral services provided to Medicare beneficiaries in two different but comparable types of facilities: (a) non-distinct-part psychiatric units of acute care hospitals (where the services are paid under IPPS) and (b) distinct-part units of acute care hospitals and freestanding psychiatric hospitals (where the services are paid under the "inpatient psychiatric facility prospective payment system" or "IPF-PPS").  Medicare uses a similar payment methodology regardless of which type of facility is involved.  The IPPS diagnosis related groups ("DRGs") used to classify patients' treatment in a non-distinct-part behavioral unit of an acute hospital are the same as the IPF-PPS DRGs used to characterize patients' treatment in an inpatient psychiatric facility, the only differences being (a) the precise numbering of each DRG

(under each respective system), and (b) the amount of final payment, which may differ depending upon the type of facility.

30.     The standards and conditions for judging whether a behavioral patient is being treated at an acute level of care, moreover, are the same, regardless of whether that patient is being treated in an IPPS-reimbursed acute care hospital psychiatric unit, or in an IPF-PPS reimbursed acute inpatient psychiatric hospital or distinct-part unit.

***Medicaid Child Inpatient Hospital Psychiatric Services Benefit***

31.     Medicaid is a joint Federal and State program established under Title XIX of the Social Security Act (the "Medicaid Act").  42 U.S.C. §1396 *et seq*.; 42 C.F.R. §430.0 *et seq*.  To participate in the Medicaid program and receive Federal funding, a State must obtain CMS approval of a "State plan" that meets Federal requirements.  A State makes Medicaid payment only for categories of "medical assistance" authorized by the Federal Medicaid statute and its State plan. 42 U.S.C. §§1396b(a)(1) (providing for matching funds at a Federal medical assistance percentage for "medical assistance under the State plan"), and 1396d(a) (defining "medical assistance").

32.     Since 1972, the Medicaid statute has provided "medical assistance" in the form of payment for "inpatient psychiatric hospital services for individuals under age 21."  42 U.S.C. §1396d(a)(16) and (h); Social Security Amendments of 1972, Pub. L. No. 92-603 §299B, 86 Stat. 1329, 1460-61. These inpatient hospital services are covered by Medicaid when provided in a hospital or "another inpatient setting that the Secretary has specified in regulations." 42 U.S.C. §1396d(h)(1)(A).

33.     The Medicaid statute further defines inpatient psychiatric hospital services as involving active treatment provided by a treatment team, consisting of physicians and other qualified personnel who have determined that the services are "necessary on an inpatient basis"

and are reasonably expected to improve the patient's condition to the "extent that eventually such services will no longer be necessary." *Id.* §1396d(h)(1)(B).  The regulations governing the child inpatient psychiatric hospital benefit generally track the Federal statute. 42 C.F.R. §§440.160, 441.150 *et seq.*

34.    In order for any of the care to be paid under Medicaid as inpatient psychiatric hospital services, the State must find that these statutory and regulatory requirements for those services are met.  *See id*. §441.150.  The obligation to ensure that these services are appropriate is a continuing one, as CMS's regulations require the treatment team to review the patient's plan of care every 30 days to recommend changes based on the patient's adjustment to inpatient status as well as to determine that "services being provided are or were required on an inpatient basis."  *Id*. §441.155(c)(1).  Through this process, Medicaid ensures that inpatient hospital care is appropriate for a given patient.

### *Oklahoma Medicaid Program Requirement for Reimbursing for Child and Adolescent Inpatient Hospital Psychiatric Services*

35.    The Medicare program recognizes two basic platforms for delivering psychiatric services: (1) inpatient services, provided in an acute-level psychiatric unit (distinct-part or non-distinct-part) or freestanding psychiatric hospital, or (2) outpatient services.  The Medicare program does not recognize other levels of psychiatric care as distinctly reimbursed treatment services.  Medicare pays all inpatient services the same way, on the basis of a pre-set, bundled DRG amount for the entire inpatient stay (subject to an outlier payment for stays that significantly exceed the average).

36.    States, on their own or through their Medicaid programs, frequently recognize several different settings for delivering psychiatric or behavioral care services, including inpatient hospital, outpatient hospital, SNF, residential care, domiciliary care, and more.  State Medicaid

programs reimburse these services in numerous ways, including DRG per stay payments, per diem payments, cost-based payments, and more.  Although Oklahoma Medicaid recognizes different settings and payment methodologies for behavioral health services, this action focuses only on services provided to children and adolescent Medicaid recipients in the inpatient hospital setting.

37.    Consistent with the Federal requirements, the Oklahoma Medicaid program provides coverage for inpatient psychiatric hospital services furnished to patients under the age of 21.  *See* Okla. Admin. Code §§317:30-5-95 – 96 (2007).  Prior to July 1, 2006, Oklahoma's Medicaid agency, the Oklahoma Health Care Agency ("OHCA"), paid for all inpatient hospital behavioral health services for children and adolescent Medicaid recipients through a per diem payment.

38.    Starting on July 1, 2006, OHCA went to a two-tiered payment system for these services for these patients: a "DRG" amount for what is often the first stage of the inpatient stay, when treatment is at its most intensive, and during which time many of the necessary initial assessments are performed, and then a "per diem" rate for a second stage of the inpatient hospitalization.  *See* Okla. Admin. Code §317:30-5-96.3 (2006).

39.    Under the terminology in the OHCA regulations that was in place from July 1, 2006 through September 13, 2020, the DRG payment is for "acute" inpatient hospital care, and the "per diem" payment is for "residential" inpatient hospital care (also called "psychiatric residential treatment facility" or "PRTF" care).  Starting September 14, 2020, the terminology in the OHCA regulations changed; while the DRG payment was still for "acute" inpatient hospital care, the "per diem" payment was changed so that it paid for "acute II" inpatient hospital care.  *See* Okla. Admin. Code §317:30-5-96.3 (2021).

40.    Although the use of the terms "acute" and "residential" for the period from July 1, 2006 through September 13, 2020, could be interpreted to convey the impression that the inpatient

hospital services paid on a "per diem" basis are not viewed by OHCA as acute care hospital services, the CEO of OHCA stated in a letter to CMS dated October 2, 2008, that services in hospital-based units, such as the Four Units, are all "acute care" services.  The Oklahoma State legislature confirmed this interpretation in a resolution adopted in 2016. *See* Okla. Sen. Res. 71 (May 17, 2016) (*available at* http://webserver1.lsb.state.ok.us/cf_pdf/2017-16%20ENR/SRES/SR71%20ENR.PDF).

41.    More fundamentally, however, all of the services provided in the Four Units, whether paid under the "acute" DRG or "residential" per diem, are covered and paid under the singular federal Medicaid benefit covering "inpatient psychiatric hospital services furnished to patients under the age of 21," as reflected in implementing State regulations.  *See* Okla. Admin. Code §317:30-5-96.3 (describing methods of payment for inpatient psychiatric services); *see also* Okla. Admin. Code §317:30-5-95.24 (2008) (requiring prior authorization for all inpatient hospital psychiatric services, whether "acute" or "residential").  Further, according to OHCA CEO's letter to CMS, "[t]he staffing and care requirements for the provision of psychiatric care services are the same for both DRG paid and per diem paid services."

42.    Also, pre-authorization from the State is required for all inpatient hospital psychiatric services for children and adolescents under 21.  *Id.* §317-30-5-95.24 (2007).  For acute care payment, a patient must have a specific psychiatric diagnosis with symptoms that could not be managed in a less secure setting and also demonstrate behavior in the previous 48 hours that presents an imminent life-threatening emergency that requires 24-hour nursing and medical supervision.  *Id.* §317-30-595.25 (2007). The admission criteria for services paid by the State as residential are largely the same as for acute payment except that the patient must have received prior treatment under the acute payment methodology and within the previous 14 days the patient

must show an escalating pattern of self-injurious or assaultive behaviors that require 24-hour observation and treatment. *Id*. §317-30-5-95.29.

43.    In contrast, under the Medicare program, all inpatient care would be paid by DRGs through either the IPPS or the IPF-PPS, as inpatient hospital care, provided the acute inpatient treatment was deemed to have been necessary and furnished at a facility that was delivering acute psychiatric hospital services.  Whereas OHCA's terminology of "acute" and "residential" was important for the period from July 1, 2006 through September 13, 2020, for determining how the services are paid by OHCA, that terminology changed as of September 14, 2020 to substitute "acute II" for "residential" confirming that (a) both levels are payment are for acute care services, and (b) the term "residential" signifies nothing with respect to how the inpatient hospital psychiatric services should be characterized for purposes of constituting (or not constituting) acute inpatient psychiatric services payable under Medicare.

44.    More importantly, the record shows that the actual services furnished within the Four Units to "acute" patients on the one hand, and to "residential" patients on the other hand, are virtually indistinguishable and all payable under IPPS.  Child and adolescent patients may have been admitted to the Four Units as "acute" patients following a major behavioral event (*e.g*., an attempt at self-harm, or harm to others, other uncontrollable destructive conduct, PTSD due to abuse, a psychosis-fueled breakdown), and then seamlessly after several days, after OHCA finds that the DRG payment at the "acute" level has reached its day limit, the patient may be "transferred" to "residential" patient status for payment purposes.  Yet, despite the "transfer" from "acute" to "residential" status for payment purposes, the patient typically remains in the same hospital bed, attends the same therapy groups, has the same psychotherapist, psychiatrist, nurses, and largely follows the same program with almost imperceptible variations.  The undisputed

evidence at the PRRB hearing was that patient care in the Four Units was not distinguishable based on whether patients were paid under the DRG versus the per diem methodologies.

45.     The State also imposes requirements on hospitals that provide inpatient psychiatric hospital services to patients under 21 years of age, chief among them that the hospital beds must be licensed with the State as inpatient hospital beds in order to receive payment at the acute level, and that the hospital beds must be licensed with the State as residential treatment beds in order to receive payment at the residential level.  *Id.* §317-30-5-95.

## MEDICARE APPEALS PROCESS

46.     Final determinations about how much Medicare payment a hospital is owed for a given fiscal year are made by the hospital's assigned MAC, which acts on behalf of CMS.  *See* 42 U.S.C. §1395h.  At the close of a hospital's fiscal year, the hospital is required to file a Medicare cost report with the MAC.  42 C.F.R. §413.20.  The MAC reviews the report and issues a payment determination, known as a Notice of Program Reimbursement ("NPR"), setting forth the MAC's final determination of the total amount of Medicare payment due to the hospital for services furnished to Medicare beneficiaries during the fiscal year covered by the cost report. 42 C.F.R. §405.1803.

47.      If a hospital is dissatisfied with the MAC's final determination of the total amount of Medicare program reimbursement due the hospital, as reflected in the NPR, and the disputed amount satisfies the amount-in-controversy threshold, the Medicare statute grants the hospital a right to obtain a hearing before the PRRB, an administrative tribunal comprised of five members appointed by the Secretary, by filing an appeal within 180 days of receiving its NPR.  42 U.S.C. §1395oo(a)(1); 42 C.F.R. §§405.1835 – 405.1877.

48.     The decision of the PRRB, on substantive or jurisdictional matters, constitutes final administrative action unless the Secretary reverses, affirms, or modifies the decision within 60 days of the hospital's notification of the PRRB's decision.  42 U.S.C. §1395oo(f)(1); 42 C.F.R. §§405.1875 and 405.1877.  The Secretary has delegated authority under the statute to review PRRB decisions to the CMS Administrator.

49.     A hospital may obtain judicial review of a final administrative decision, whether substantive or jurisdictional, by filing suit within 60 days of receipt of the final action on the administrative appeal in the United States District Court for the judicial district in which the hospital is located or in the United States District Court for the District of Columbia.  42 U.S.C. §1395oo(f).  In any such action, the Secretary is the proper defendant because, under 42 C.F.R. §421.5(b), the Secretary, acting through CMS, "is the real party of interest in any litigation involving the administration of the [Medicare] program."  Under 42 U.S.C. §1395oo(f)(2), interest is to be awarded in favor of a hospital that prevails in an action brought under 42 U.S.C. §1395oo(f).

50.     Judicial relief is available under the equitable remedy of mandamus where a hospital has a clear right to the relief sought and the Secretary has a defined and non-discretionary duty to honor that right.  *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807 (D.C. Cir. 2001).

## FACTUAL BACKGROUND

51.     The Hospital is a Medicare "subsection (d) hospital" that, at all times relevant to this action, qualified as a Medicare DSH hospital and operated the Four Units, which furnished inpatient psychiatric hospital services to patients under the age of 21.  The services furnished in the Four Units were intended for patients who required far more intensive services than could have

been provided in an outpatient setting and, further, involved intensive, comprehensive, multimodal treatment that included 24-hours per day of medical supervision and coordination.

52.     Inpatient psychiatric services provided in a psychiatric unit of an IPPS hospital are paid under IPPS, unless the services are furnished in a Medicare-certified distinct-part exempt unit. *See* 68 Fed. Reg. at 66,922.  CMS has listed the many psychiatric DRG codes that are payable under IPPS when furnished in a psychiatric ward of an IPPS hospital that is *not* a distinct-part unit. *See, e.g.,* 72 Fed. Reg. 47,130, 47,556 (Aug. 22, 2007) (providing DRG codes for psychiatric conditions covered under IPPS for FFY 2008).  Thus, an inpatient stay classified to any one of these DRG codes is unquestionably payable under the IPPS for FY 2008, the cost year at issue.

53.     This is precisely what occurred at the Hospital.  The inpatient services furnished to the patients in the Four Units satisfied every material requirement established by Medicare for reimbursing acute level psychiatric services to Medicare beneficiaries under IPPS.  As such, the inpatient days from the Four Units must be counted for DSH payment purposes.  Although the State regulatory requirements for "residential" payment had some elements that were lower than the requirements for "acute" payment, (a) even the State "residential" requirements met all Medicare standards, and (b) the Hospital's unrebutted testimony was that, because the Hospital's caregivers did not know which patient were being paid under the "acute" versus "residential" categories, the Hospital provided all services to meet the "acute" payment requirements.

54.     All of the beds in the Four Units were used to provide inpatient psychiatric hospital services that were reimbursed by the Oklahoma Medicaid Program in FY 2008 as both "acute" or "residential" and none of the Four Units were segregated by reimbursement level.  As required by the State, all beds in the Four Units were dually licensed both as inpatient hospital beds and

residential treatment beds.  For FY 2008 year, approximately 91 percent of the patients treated at the Four Units were eligible for Medicaid.

55.    But perhaps most fundamentally, the services provided in the Four Units are properly viewed as acute care hospital services payments because they were all covered and paid as <u>inpatient hospital psychiatric services</u> under the Federal <u>Medicaid</u> statute (42 U.S.C. §1396d(h)(1)).  State regulatory verbiage cannot overcome the clear Federal statute showing that the services at issue were acute care hospital services.

56.    When the Hospital acquired the Four Units in 2004, CMS had always included the Medicaid-eligible inpatient days from the Four Units when calculating DSH payments for hospitals in Oklahoma.  The record at the PRRB includes an email exchange from 2005 where a MAC stated that CMS policy was to include such days for DSH purposes and there was no plan to change that policy.

57.    In 2008, however, CMS supposedly became concerned about the cost associated with including the Medicaid-eligible inpatient days from child and adolescent behavioral health units in the numerator of the Medicare DSH Medicaid fraction, in part because virtually all of the patients in these units were Medicaid-eligible.  Focusing on a different hospital in Oklahoma, CMS questioned whether the care provided in the child and adolescent behavioral health units at that other hospital were at an intense enough level to qualify for payment under IPPS.  If not, CMS's position was that the Medicaid-eligible inpatient days from these units should not be included in the numerator of the Medicare DSH Medicaid fraction.

58.    CMS instructed the MAC for the other hospital to perform a medical review of the six child and adolescent behavioral health units at that other hospital using a "50% test" to determine whether the units provided an acute inpatient hospital level of care generally payable

under IPPS.  Under that test, if the MAC determined that the services of at least 50% of the patient days from the sampled claims were at an acute inpatient hospital level of care, the Medicaid-eligible days from the entire unit would be included in the numerator of the Medicaid fraction for purposes of calculating the DSH payment.  If, however, the MAC determined that the services of less than 50% of the patient days from the sampled claims were at an acute inpatient hospital level of care, the Medicaid-eligible days from the entire unit would be excluded from the numerator of the Medicaid fraction for purposes of calculating the DSH payment.

59.    The MAC issued its medical review report for the other hospital on August 5, 2009, resulting in the exclusion of the inpatient days from the three units that did not meet the 50% test, and the inclusion of days from the three units that met the 50% test.  The resulting Medicare DSH disallowance for that other hospital followed.  The PRRB upheld the disallowance of the inpatient days from the three units at the other hospital that did not meet the 50% test.  However, the inpatient days from the three units at the other hospital that met the 50% test were counted for DSH purposes.

60.    Even though CMS knew from this report that a child/adolescent inpatient behavioral health unit <u>may</u> provide an acute level of care, the MAC <u>nevertheless disallowed</u> for Medicare DSH purposes <u>all</u> of the Medicaid-eligible inpatient days from the Four Units <u>without performing any medical review</u>.  CMS's reversal of its longstanding policy, which it retroactively first applied in 2015, had such a devastating budgetary effect that the Four Units were closed shortly thereafter.

## PROCEDURAL BACKGROUND

61.    The MAC audited the Hospital's "as-filed" FY 2008 Medicare cost report and issued the NPR on February 26, 2016, which included the disallowance for Medicare DSH purposes of all

inpatient days from the Four Units.  The Hospital timely appealed its FY 2008 NPR to the PRRB, which assigned case number 16-2092.

62.     The PRRB conducted a live hearing in two parts totaling four days: October 22–23, 2019, and February 20–21, 2024.  At the hearing, the Hospital presented two lay witnesses and three witnesses accepted by the PRRB as experts.  The Hospital used a statistical sampling PRRB-accepted expert to draw a statistically valid sample of claims from each of the Four Units from FYs 2006, 2007, and 2008.

63.     These claims were reviewed by a PRRB-accepted expert in medical claim coding to determine if the patients needed and received an acute inpatient hospital level of care during the stay reflected in the claims, applying the same methodology that the MAC had used to perform its medical review at the child and adolescent units at the other Oklahoma hospital in 2009.  For any claim for which the coding expert could not determine whether the patient needed and received an acute inpatient hospital level of care during the stay, a PRRB-accepted expert psychiatrist who specialized in treating children and adolescents reviewed the claim, consistent with the methodology that the MAC had used to perform a medical review at the child and adolescent units at the other Oklahoma hospital in 2009.  The result of these reviews was that, for 320 of the 330 days in the sampled claims (96.97%), the patients were found to have needed and received an acute inpatient hospital level of care.  Thus, the Four Units obviously met the 50% test that the CMS instructed the MAC to use for its medical review and all of the inpatient days from the Four Units should have been included in the numerator of the Medicaid fraction consistent with the treatment by CMS of the inpatient days from the three units at the other hospital that met the 50% test.

64.     The Hospital included in its presentation to the PRRB testimony that the MAC's expert witness had provided in an appeal on this issue involving a different Oklahoma hospital stating

that the average length of stay "for acute care hospitals should be approximately 25 days." Exhibit A at 13. In the Hospital's appeal, the MAC found that the average length of stay for the Four Units for FY 2008 was 13.4 days (*id*. at 35), well within the range of what the Secretary's own expert witness testified under oath would be expected in an acute care hospital.

65. The record also contains documents related to a claim for services provided in one of the Four Units (the Adolescent Residential Unit) to a 17-year old who became eligible for Medicare after a kidney transplant and remained on Medicare during a 35-day inpatient stay in that Unit from August 18 through September 22, 2010. Exhibit A at 15-16, n.114. The primary discharge diagnosis was DRG 885 (Psychoses) and Medicare processed and paid the claim under IPPS. This claim shows that services provided in the Four Units were generally payable under IPPS and the MAC did not identify any claim from the Four Units that Medicare refused to pay under IPPS.

66. At the hearing, the MAC did not call any witnesses or provide any rebuttal testimony, thereby leaving the record of this matter bereft of any factual support for the Secretary's position that the Four Units do not provide an inpatient acute care hospital level of care payable under IPPS.

67. On September 30, 2024, the PRRB issued its decision in the Hospital's appeal. *See* Exhibit A. In the decision, the PRRB upheld the exclusion of all inpatient days from the Four Units because the MAC "properly determined that the Four Units at OKSU-MC did not 'provid[e] acute care services generally payable under the prospective payment system' in accordance with 42 C.F.R. §412.106(a)(1)(ii) (as of Dec. 1, 2007)." *Id*. at 49.

68. In reaching its decision, the PRRB found that the Hospital "failed to establish, by a preponderance of the evidence, that the type of care generally provided in each of the Four Units, as

whole [*sic*], is care that would be generally payable under IPPS." *Id.* at 20. In doing so, the PRRB "decline[d] to give any weight to the medical review that OKSU-MC performed for the Four Units," despite the fact that (a) the medical review testimony was unrebutted and the PRRB accepted as experts all three of the Hospital's expert witnesses and (b) there is <u>no</u> evidence to support a contrary conclusion. *Id.* at 39. Instead of requiring the MAC to prove that the Four Units <u>did not</u> provide inpatient acute care services payable under IPPS in FY 2008, the PRRB spent 20 single-spaced pages attempting to "poke holes" in the Hospital's testimony and evidence. *Pomona Valley Hosp. Med. Ctr. v. Becerra*, No. 18-cv-2763, 2020 WL 5816486, at *10 (D.D.C. Sept. 30, 2020). By using this approach, the PRRB "did not make a serious effort to address" whether the MAC's disallowance was actually supported by substantial evidence (it was not). *Id.* The PRRB also "questioned the validity and evidentiary value" of the MAC medical review report of another Oklahoma hospital that CMS had ordered in 2009. *Id.* at 39.

69. The PRRB relied heavily on its position that a PRTF is generally a "non-acute inpatient facility." *Id.* at 21, 26. In doing so, the PRRB ignored that the Hospital's Post-Hearing Brief (at 64-66) explained that the CMS Administrator found that a PRTF can provide an acute inpatient hospital level of care. The PRRB's decision also downplays the fact that the Four Units were recognized by the State of Oklahoma as "hospital-based PRTFs," which are obviously licensed for the purpose of providing hospital-level PRTF care. *Id.* at 24-25, n.20.

70. The PRRB also ignored unrebutted facts in the Hospital's Post-Hearing Brief (at 7, n.4) showing that the Secretary had taken the position in litigation pending in Federal Court on this issue that hospital-based child and adolescent behavioral health units in Oklahoma, such as the Four Units, can provide inpatient acute care services payable under IPPS. *See* Secy's Mem. in Supp. of Def's Cross-Mot. for Sum. J., *Baptist Healthcare of Ok. v. Becerra*, 23-cv-00625 (D.D.C.)

at 32, ECF No. 16-1 (conceding that Medicaid-eligible days from child and adolescent behavioral health units may be counted if "the type of care generally provided in the unit or ward, as a whole, [is] … acute care of the type generally payable under [IPPS]."); *id.* at 28 (conceding that under Oklahoma Medicaid regulations define "acute care as 'care delivered in a psychiatric unit of a general hospital….").  The Hospital's Post-Hearing Brief added (at 7) that the PRRB "is prohibited by regulation, and the Secretary and CMS are prohibited by judicial estoppel, from taking a contrary position here."  The PRRB Decision does not address the Secretary's statements which directly contradict the PRRB's conclusions about the type of care provided in PRTFs.

71.    In addition to the general descriptions of PRTFs, the PRRB also emphasized that, while "the length of stay is not dispositive, the nature of PRTF care is 'residential' and the available guidance on length of stay supports the conclusion that, on the whole, the care provided to the PRTF patients in the Four Units were organized for treatment of conditions 'distinctly unlike' treatment encountered in short-term acute care facilities."  *Id.* at 37.  In doing so, the PRRB failed to address the unrebutted record evidence of the MAC having found that more than half of the discharges from the Four Units in FY 2008 were for "acute" services."  *Id.* at 8.  The PRRB also found that the average length of stay in the Four Units of 13.4 days "supports the finding that the services provided for PRTF patients do not resemble the type of care generally payable under IPPS" (*id.* at 37); but this again failed to address the unrebutted testimony of the MAC's expert in a different hearing on the issue in this case that the average length of stay in an acute care hospital "should be approximately 25 days."

72.    The PRRB's decision also swept aside as "irrelevant" the Hospital's arguments that CMS's exclusion of the days in the Four Units from the Medicaid fraction because they allegedly were not at an acute inpatient hospital level of care is inconsistent with CMS's inclusion of days from

other units that provide services not at an acute inpatient hospital level of care, such as the units serving healthy newborns, in the DSH calculation. *Id.* at 39. Yet the PRRB failed to explain how the treatment of the two types of days could be reconciled. The PRRB also failed to explain how to reconcile the inclusion for DSH purposes of all inpatient days from the three child and adolescent units at another Oklahoma hospital that met the 50% test with the exclusion of all inpatient days from the Four Units, all of which easily met the 50% test.

73. The PRRB failed to address the Hospital's other procedural arguments that, under the Medicare statute, CMS's change to the treatment of days in the Four Units required notice-and-comment rulemaking before becoming effective and could not be made retroactively and without requisite notice.

74. In addition to the foregoing examples, the PRRB's decision both failed to address other unrebutted evidence that contradicted the PRRB's conclusions and was otherwise irrational and not based on substantial evidence.

75. Because the CMS Administrator declined to review the PRRB's decision, the PRRB's decision is the final determination of the Secretary for purposes of judicial review. 42 U.S.C. §1395oo(f). By timely filing this Complaint, the Hospital has properly commenced this action for judicial review under 42 U.S.C. §1395oo(f)(1).

## THE PRRB'S DECISION IS UNLAWFUL AND MUST BE REVERSED

76. The Medicare statute provides for judicial review of the questions presented here "pursuant to the applicable provisions under chapter 7 of title 5," *i.e.*, the APA. 42 U.S.C. §1395oo(f)(l).

77. The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . (A) arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence."  5 U.S.C. §706(2).  Applying these standards, the PRRB's decision should be found to be unlawful and set aside, including for the reasons detailed below.

## COUNT I
## Arbitrary and Capricious and Unsupported by Substantial Evidence Under the APA
## (Decision is Unsupported by the Evidence in the Record)

78.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint.

79.    The APA requires reviewing courts to reverse agency determinations that are "unsupported by substantial evidence."  5 U.S.C. §706(2)(E).  Under the "substantial evidence" standard, an agency must consider the whole record upon which an agency's factual findings are based, including whatever in the record fairly detracts from the evidence supporting the agency's decision.  *See, e.g.*, *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018).

80.    The PRRB's decision upholding the MAC's disallowance of the Medicaid-eligible days from the Four Units must be set aside under the APA because there is no evidentiary basis for the PRRB's conclusion that the Four Units did not provide inpatient acute care services payable under IPPS in FY 2008.  This is because (a) the MAC conceded below that no medical review was done at the Four Units (for FY 2008 or otherwise), (b) CMS instructed the MAC not to perform medical review at the Four Units, and (c) the MAC did not provide any evidence or testimony to support a finding that the Four Units did not provide inpatient acute care services payable under IPPS in FY 2008.  *Algonquin Gas Transmission Co. v. FERC*, 948 F.2d 1305, 1313 (D.C. Cir. 1991) ("[a]n agency's unsupported assertion does not amount to substantial evidence.").

81.     Rather, the Hospital provided substantial unrebutted testimony and evidence, including from three PRRB-accepted experts, that for 96.97% of the inpatient days in a statistically-valid sample of inpatient services provided in the Four Units, the patients needed and received an acute inpatient hospital level of care payable under IPPS.  The PRRB's finding that the Four Units did not provide inpatient acute care services payable under IPPS in FY 2008 must be reversed because (a) there is no evidentiary basis for the PRRB's finding, and (b) the evidence in the record overwhelmingly supports the opposite conclusion.  *See Pomona Valley Hosp. Med. Ctr. v. Becerra*, 82 F.4th 1252 (D.C. Cir. 2023) (affirming District Court's reversal of the PRRB's decision based on lack of substantial evidence where, as here, the hospital presented unrebutted testimony and evidence).

82.     Instead of requiring the MAC to rebut the Hospital's evidence that the Four Units provided inpatient acute care services payable under IPPS in FY 2008, the PRRB believed that it could uphold the MAC's disallowance merely by "poking holes" in the Hospital's testimony and evidence.  *Pomona*, 2020 WL 5816486, at *10.  By using this approach, the PRRB "did not make a serious effort to address" whether the MAC's disallowance was actually supported by substantial evidence (it wasn't).  *Id.*

## COUNT II
## Judicial Review Under the APA and the Medicare Act
## (Decision is Contrary to Law)

83.     Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint.

84.     The PRRB's blanket exclusion as a matter of law of the Medicaid-eligible days from the Four Units also must be set aside because it (a) is inconsistent with the plain wording of the DSH statute, and (b) defeats the clear purpose of that statute.  The PRRB's decision should also

be set aside because it is inconsistent with the plain language and intent of the Secretary's DSH regulation.

85.     Congress enacted the Medicare DSH statute to provide additional payments to hospitals, including the Hospital, that treat a high percentage of low-income patients and explicitly required CMS to count days related to Medicaid-eligible inpatients.   Here, the Hospital indisputably incurred the costs of providing inpatient acute care hospital services to the Medicaid-eligible patients in the Four Units.   Thus, the only question is whether the refusal to count the inpatient days relating to the patients is supported by the "single, best meaning" of the DSH statute. *See, Loper Bright, supra.*

86.     The PRRB's decision limiting inclusion in the DSH calculation to only those areas of the hospital that provide "acute care services generally payable under [IPPS]," is contrary to the DSH statute.   The relevant statutory text addresses the "patient days" of a "hospital" for a "cost reporting period."   42 U.S.C. §1395ww(d)(5)(F)(vi)(II).   There is no statutory authority to reduce the Medicaid fraction by excluding the patient days in an area of an inpatient hospital based on the proportion of the services furnished in that area or unit that are payable under IPPS or otherwise.   *See Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 489 (D.C. Cir. 2007) (interpreting statutory terms in accordance with "their ordinary or natural meaning" where there "is nothing to suggest that Congress" intended otherwise (internal quotation marks omitted)).

87.     Based on the plain and proper reading of the DSH statute, the Hospital's FY 2008 DSH Medicaid fraction numerator was required to have included all of the Medicaid-eligible days from the Four Units because (a) the Hospital incurred the costs of treating these more expensive patients, (b) the Hospital is paid under IPPS, (c) the Four Units were part of the Hospital and none

of the Four Units was a distinct-part unit, and (d) the services provided in the Four Units were all generally payable under IPPS.

88.    It is also inconsistent with the purpose and intent of the DSH payment adjustment. CMS has provided no reason for the exclusion of the patient days at issue that is "consistent with the underlying statutory scheme in a substantive sense" and reflects that the agency has "considered the matter in a detailed and reasoned fashion." *ITT Indus., Inc. v. NLRB*, 251 F.3d 995, 1004 (D.C. Cir. 2001).

89.    The PRRB's decision should also be set aside because it is inconsistent with the plain language and intent of the Secretary's DSH regulation.  The patient days in the Four Units must be counted in the Medicaid fraction of the DSH calculation because those units provide "acute care services generally payable under [IPPS]."  42 C.F.R. §412.106(a)(1)(ii) (2007).  It is undisputed that the beds in the Four Units were Medicare-certified and licensed as inpatient hospital beds.  Further, those beds were located in a non-exempt area of the Hospital that was subject to IPPS, and the Four Units provide services (almost entirely to Medicaid-eligible patients) billed using medical codes that generally would be payable under IPPS, if the patients were entitled to Medicare, to patients who needed and received inpatient acute care hospital services during their entire inpatient stay.  In addition, the State Medicaid program and the State legislature have confirmed that the services furnished to Medicaid patients in those units were "acute" inpatient hospital services that receive the same level of care regardless of labels used for State Medicaid reimbursement purposes.

**COUNT III**
**Judicial Review Under the APA**
**(Decision is Arbitrary and Capricious)**

90.     Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint.

91.     Under the APA, the reviewing court shall set aside the final agency decision if, *inter alia*, it is contrary to law, arbitrary and capricious, an abuse of discretion, or unsupported by substantial evidence in the record.  5 U.S.C. §706.

92.     The Secretary has taken the position in litigation pending in this Court on this issue that hospital-based child and adolescent behavioral health units in Oklahoma, such as the Four Units, can provide inpatient acute care services payable under IPPS.  *See* Secy's Mem. in Supp. of Def's Cross-Mot. for Sum. J., *Baptist Healthcare of Ok. v. Becerra*, 23-cv-00625 (D.D.C.) at 32, ECF No. 16-1 (conceding that Medicaid-eligible days from child and adolescent behavioral health units may be counted if "the type of care generally provided in the unit or ward, as a whole, [is] … acute care of the type generally payable under [IPPS].");  *id.* at 28 (conceding that under Oklahoma Medicaid regulations define "acute care as 'care delivered in a psychiatric unit of a general hospital….').  Thus, the PRRB decision on this point is unlawful and the Secretary is prohibited by judicial estoppel from taking a contrary position here.

93.     The PRRB's decision also is arbitrary and capricious because it is inconsistent with other DSH policy without a rational explanation. Specifically, CMS routinely includes Medicaid-covered days furnished in another area of a hospital, the healthy newborn nursery, in the DSH Medicaid fraction precisely because those patient days are covered by Medicaid, even if not generally covered by Medicare and payable under IPPS.  68 Fed. Reg. at 45,417. The PRRB failed to provide any rational basis to distinguish the Medicaid-covered inpatient services furnished in a healthy

newborn nursery and the Medicaid-covered inpatient services furnished in the Four Units that supports including the former and excluding the latter patient days in the Medicaid fraction.

94.    It is well-settled that when an agency treats similar situations differently, it must provide a "reasoned analysis" for its disparate treatment. *See Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996). The agency must explain "*how* it evaluated" the factors that led to its disparate treatment of similar situations and "*why* its evaluation" of those factors led to its disparate treatment. *See Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1313 (D.C. Cir. 2014) (emphasis in original). The PRRB's bald conclusion that the newborn nursery days are "not relevant" fails this test.

95.    The PRRB's decision also is arbitrary and capricious because it conflicts with CMS's decision to include for DSH purposes all inpatient days from the three child and adolescent units at another Oklahoma hospital that met the 50% test.  The Hospital's unrebutted evidence at the hearing demonstrated that the Four Units easily met the 50% test.  It is arbitrary and capricious for CMS to <u>exclude</u> the Medicaid-covered services furnished in the Four Units while <u>including</u> Medicaid-covered services in three similar units at the other hospital, without any explanation for the differing treatment.

96.    The Hospital also is entitled to reversal of the MAC's adjustments because the unrebutted record facts demonstrate that the Four Units provided acute care generally payable under IPPS, including that the Four Units had an average length of stay that was about half the average length of stay that the MAC's expert testified in a different case would be expected at an acute care hospital.

**COUNT IV**
**Judicial Review Under the APA and the Medicare Act**
**(Decision is Contrary to Law Because it Violates the Medicare Statute's**
**Publication Requirement (42 U.S.C. §1395hh(c)(1)) and the Principles of Fair Notice)**

97.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint.

98.    The Medicare Act requires the Secretary to use notice-and-comment rulemaking to change a substantive legal standard governing payment.  *See* 42 U.S.C. §§1395hh(a)(1)-(2) & 1395hh(b) (providing that no "rule, requirement, or other statement of policy . . . establishes or changes a substantive legal standard governing . . . the payment for services . . . shall take effect unless it is promulgated by the Secretary by regulation" with advance notice published in the Federal Register and advance opportunity for comment); *see also* 5 U.S.C. §553 (APA rulemaking requirements); *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (A court may not accept an agency's interpretation of a rule that is contrary to "the regulation's plain language or [to] other indications of the Secretary's intent at the time of the regulation's promulgation."); *see also Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) (court will not "defer to the agency's position" when it would "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation").

99.    The new interpretation that the MAC used to exclude the inpatient days from the Four Units from the Hospital's FY 2008 DSH calculation cannot be applied to the Hospital, whether for FY 2008 or any other FY, because the Secretary did not adopt it using notice-and-comment rulemaking.  Moreover, even if the Secretary had properly used notice-and-comment rulemaking to change the DSH regulation, such a change could only apply prospectively to a cost year that begins <u>after</u> the change becomes effective.  *See* 42 U.S.C. §§1395hh(a)(1)-(2) and 1395hh(b); *Northeast Hosp. Corp. v, Sebelius*, 657 F.3d 1, 13–14 (D.C. Cir. 2011).

100.    It also is well-settled that an agency cannot apply an interpretation of a regulation (or apply a new policy) retroactively to "penalize" an entity that did not have "fair notice" of that interpretation.  *See Encino Motorcars, LLC v, Navarro,* 579 U.S. 211, 212 (2016) (Emphasizing that "an agency must be cognizant that longstanding polices may have 'engendered serious reliance interests that must be taken into account."); *Gen. Elec. Co. v. United States Envt'l Prot. Agency*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) ("as long ago as 1968, we recognized this 'fair notice' requirement in the civil administrative context"); *Satellite Broadcasting Co., Inc. v. Fed. Commc'n*, 824 F.2d 1, 3 (D.C. Cir. 1987) ("Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule"); *Grancare, Inc. v. Shalala*, 93 F. Supp. 2d 24, 31-34 (D.D.C. 2000) (reversing CMS' disallowance of providers' therapy costs because CMS did not afford the providers fair notice that the agency's "prudent buyer" guidelines permitted the disallowance of costs not shown to be substantially out of line as required under the regulations).  Thus, even supposing CMS <u>could</u> properly exclude the Medicaid days from the Four Units from the DSH calculation under <u>certain</u> circumstances, which it cannot, CMS could not apply such an exclusion retroactively to the Hospital's FY 2008 under the circumstances presented by this appeal.

101.    Also important is 42 U.S.C. §1395hh(e)(1)(A), which provides that a "substantive change in regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability . . . shall not be applied . . . retroactively," except under limited circumstances that indisputably are not applicable here.  The precedent cited above applies also to longstanding practices, such as the MAC's consistent inclusion of Medicaid days from the Four Units when calculating the Hospital's DSH payments, as there is no "legally significant difference

between practice and policy." *Allina Health Servs. v. Sebelius*, 904 F. Supp. 2d 75, 88 (D.D.C. 2012), *aff'd in part, rev'd in part*, 746 F.3d 1102 (D.C. Cir. 2014) (citing *Northeast Hosp*. 657 F.3d at 16).

102.    Before CMS's about-face interpretation of the DSH regulation reflected in the Hospital's February 26, 2016 FY 2008 NPR could be applied to FY 2008, the Hospital must first have been given the Hospital notice of that interpretation with "ascertainable certainty." *Gen. Elec. Co*., 53 F.3d at 1329; *see also Loma Linda Univ. Med. Ctr. v. Sebelius*, 408 F. App'x 383 (D.C. Cir. Dec. 2, 2010) (per curiam), *aff'g* 684 F. Supp. 2d 42 (D.D.C. 2010) (reversing a CMS disallowance of reimbursement for a hospital's indirect medical education costs because the agency had not afforded the hospital with adequate notice, with ascertainable certainty, of the agency's current interpretation of the Medicare Part A claims filing regulations).

103.    It was not until the MAC issued the Hospital's Revised NPR for FY 2007 on March 20, 2015, that the Hospital <u>first</u> received <u>formal</u> notice that the CMS was excluding inpatient days from child and adolescent behavioral health units in IPPS hospitals in Oklahoma when calculating their Medicare DSH payments.  Although CMS had previously raised some concerns about this issue, the actions of the Oklahoma Congressional delegation, the Oklahoma Hospital Association, and others starting in 2008 reasonably suggested that CMS might not radically change its policy. Exhibit A at 12.  Moreover, in 2005, a MAC stated that CMS policy was to include such days for DSH purposes and there was no plan to change that policy.

104.    Thus, CMS failed to give the Hospital requisite notice prior to FY 2008 of the reading of the DSH regulation that CMS started applying to the Hospital in 2015.  The regulation itself did not provide any notice of that interpretation.  Indeed, until the MAC issued its Revised NPR for FY 2007 in 2015, the MAC had always included the Medicaid-eligible inpatient days

from the Four Units in the Medicaid Fraction.  The MAC continued to include the days from the

Four Units even after CMS changed the DSH regulation in 2003, showing that CMS's 2003

regulation change did not provide the Hospital notice of the new policy, which CMS did not first

apply to the Hospital until 2015.

105.     The Hospital was blindsided and had no reason to expect the MAC's reduction in

DSH payments of approximately $526,969 for FY 2008, and more than $16 million combined for

FYs 2004 through 2015, given that the MAC had invariably allowed these days until reversing

course in 2015.  The reversal by CMS of its longstanding policy in 2015 had such a devastating

budgetary effect that the Four Units were closed shortly thereafter.

## COUNT V
## Mandamus

106.     Plaintiff hereby incorporates by reference all preceding paragraphs of this

Complaint.

107.     Under the Mandamus Act (28 U.S.C. §1361), federal district courts have "original

jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United

States or any agency thereof to perform a duty owed to the plaintiff."  Jurisdiction under the

Mandamus Act is available if the plaintiff has a clear right to relief, the defendant has a clear duty

to act, and there is no other adequate remedy available to the plaintiff.  *See In re Medicare

Reimbursement Litig.*, 414 F.3d at 10.  A defendant has a clear duty to act where "the duty to be

performed is ministerial and the obligation to act peremptory and clearly defined." *Shoshone

Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995) (quoting *13th Reg'l Corp. v. Dep't of

Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980)).

108.     The Secretary has the non-discretionary duty to use the correct Medicaid fraction

when determining the Hospital's DSH payment for FY 2008.  Accordingly, the Hospital is entitled

to issuance of a writ of mandamus requiring the Secretary to order the MAC to make a new DSH determination for FY 2008 using the correct Medicaid fraction. 28 U.S.C. §1361; *see also id.* §1651(a) (All Writs Act).

## REQUEST FOR RELIEF

WHEREFORE, the Hospital requests that this Court enter an Order:

1.    Setting aside the PRRB's decision and requiring the MAC to include Medicaid-eligible days associated with the Four Units in the numerator and denominator of the Medicaid fraction used to calculate the Hospital's FY 2008 Medicare DSH payment;

2.    Directing the Secretary to recalculate the Hospital's FY 2008 DSH payment consistent with the Order and to make prompt payment of any additional amounts due to the Hospital, plus interest calculated in accordance with 42 U.S.C. §1395oo(f)(2);

3.    Requiring the Secretary to pay legal fees and costs of suit incurred by the Hospital; and

4.    Providing for such other relief as the Court may consider appropriate.

Dated: November 26, 2024            Respectfully submitted,

By:   /s/ Robert L. Roth
Robert L. Roth, Esq. (D.C. Bar No. 441803)
HOOPER, LUNDY & BOOKMAN, P.C.
401 9th Street, N.W., Suite 550
Washington, D.C.  20004
Tel:  (202) 580-7701
Email: rroth@hooperlundy.com

*Attorneys for Plaintiff*